UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN GRABLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 1177 RWS |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff John Grable ("Grable") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's ("Commissioner") decision to terminate his Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits.  For the reasons explained below, I will reverse the Commissioner's decision and remand this matter for further proceedings.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

This case began as a continuing disability review case.  In a decision dated April 27, 2006, an administrative law judge ("ALJ") found Grable disabled as of April 11, 2005.[2] (Tr. 150.)  Grable was 35 years old at the time of this decision. While working as a tree cutter, he fell 50 feet out of a tree and fractured his spine and two legs.  (Tr. 150-51.)  After the accident, he was partially paralyzed, experienced neuropathic pain, required "extensive therapy," and was "virtually unable to stand or walk."  (Tr. 151.)

In 2014, the Social Security Administration ("SSA") commenced a continuing disability review.   An investigation by the SSA's Cooperative Disability Investigations ("CDI") Unit revealed a handful of posts Grable made on his Facebook page between May and August 2014, offering to pick up lumber and scrap metal that anyone was looking to "get rid of" and offering to do work ("no job to[o] big or small") in exchange for scrap metal.  (Tr. 497.)  Additionally, on September 15, 2014, investigators observed Grable walking normally, without a cane, and getting in and out of his truck without apparent difficulty.  (Tr. 498-99.)

After the SSA determined that Grable was no longer disabled, he filed a request for a hearing, which was held on November 16, 2015.    (Tr. 154-57.)  On July 7, 2016, an ALJ issued a decision finding that Grable's disability ceased as of

_____

[2] This is known as the "comparison point decision" ("CPD").

2

October 15, 2014, and that he was no longer eligible for benefits. (Tr. 161-67.) Grable appealed the decision, and the Appeals Council granted his request for review.  The case was remanded.  Additional hearings were held on May 8, 2018 and April 4, 2019.  After the first hearing, Grable amended his alleged onset date of disability to January 14, 2016.  (Tr. 10, 82, 448-49.)  On September 3, 2019, the ALJ issued another unfavorable decision reconfirming that Grable was not disabled from October 15, 2014 through the date of her decision.

In this action for judicial review, Grable argues that the ALJ did not identify all of his severe medical impairments; did not properly evaluate the medical opinion evidence in the record; formulated a residential functional capacity ("RFC") that was not supported by substantial evidence; and did not properly consider his subjective complaints of pain.

## LEGAL STANDARD[3]

To be eligible for disability insurance benefits under the Social Security Act, a plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th

_____

[3] The Social Security Administration issued new regulations regarding the evaluation of medical evidence for applications filed on or after March 27, 2017.  See 20 C.F.R. §§ 404.1520(c) and 416.920(c).  Grable amended his alleged onset date of disability to January 14, 2016 on July 13, 2018.  The ALJ considered the opinion evidence in the record in accordance with 20 C.F.R. § 404.1527, which governs applications filed before March 27, 2017.  Because the parties did not contest, or even discuss, the application of the old regulations in their briefs and because these proceedings began as a continuing disability review based on an application filed long before March 27, 2017, I find that the ALJ did not err in analyzing the evidence under the old regulations.

Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner ordinarily conducts a five-step analysis.  See 20 C.F.R. § 404.1520; Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  A different analysis applies in the continuing disability review process.  Delph v. Astrue, 538 F.3d 940, 945 (8th Cir. 2008).  This analysis requires the Commissioner to determine:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether

4

the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

Id. at 945-46 (citations omitted).

In reviewing the ALJ's denial of Social Security disability benefits, my role is limited to determining whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, I must consider evidence that both supports and detracts from the Commissioner's decision.  Id.  I must "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (internal citation omitted).  I may not reverse a decision that is supported by substantial evidence in the record, even if substantial evidence in the record supports a contrary outcome, or if I would have decided the case differently in the first instance.  Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011).

## ADMINISTRATIVE RECORD

With respect to the medical records and other evidence of record, I adopt Grable's recitation of facts set forth in his Statement of Uncontroverted Material Facts, to the extent that they do not directly conflict with the Commissioner's

Statement of Uncontroverted Material Facts and are supported by the record.
Specific facts will be discussed as needed to address the parties' arguments.

## HEARINGS BEFORE THE ALJ

Grable was 47 years old when he appeared at the May 8, 2018 hearing before
the ALJ.  (Tr. 118.) He was represented by an attorney, who summarized Grable's
recent medical history at the beginning of the hearing.  He explained that Grable had
an upcoming appointment to discuss his spinal stenosis and indicated that
appointment would be crucial to understanding the severity of Grable's neck
problems. (Tr. 115-16.)  He conceded that while Grable may have experienced some
medical improvement beginning in October 2014, as of January 2016, "there is no
doubt there are significant medical issues at play, both at the lumbar region and at
the cervical region."  (Tr. 119.)

Before questioning Grable, the ALJ noted that in 2015, clinical signs of his
cervical spine were normal and that he seemed to get revision surgery "all of
sudden."  (Tr. 124.)  She also observed that he appeared to use a cane inconsistently.
(Tr. 125.)  When she asked him about the Facebook posts that the CDI Unit had
discovered about working in exchange for scrap metal, Grable explained that he
made those posts on behalf of his nephew and son; that he never intended to do any
work himself; and that he never received any responses to the post.  (Tr. 128.)

Grable testified that he lives with his wife, adult son, and teenage nephew and that neither he nor his wife work.  (Tr. 125.)  He does not cook, do laundry, or go grocery shopping, and relies on family members to do these tasks.  (Tr. 127.)  He spends most of his days sitting or laying down because of his back pain.  (Tr. 129.) He can only sit for about an hour before he has to change positions due to the pain; he cannot walk more than 25 to 30 minutes at a time; and he cannot stand for more than 20 minutes at a time.  (Tr. 129-30.)   He uses a cane to walk because he falls "all the time" without it.  (Tr. 130.)  He has no feeling below his knees.  (Tr. 131.) He underwent surgery in April 2016 because of a ruptured disc, which he attributed to falling down the stairs at his house.  (Tr. 131.)  He was deemed a good candidate for transcutaneous electrical nerve stimulation ("TENS") therapy but did not want to pursue it because of the risk of staph infection.  (Tr. 134.)  He experiences pain in his neck which radiates down to his shoulder and to his fingers, causing numbness in his shoulder, hand, and three of his fingers.  (Tr. 137.)

Grable appeared before the ALJ a second time at a supplemental hearing held on April 4, 2019.  His attorney explained that Grable had amended his alleged onset date to January 14, 2016 because that was when the medical records began reflecting complaints of back pain again.  (Tr. 86.)  He referenced the results of an MRI that indicated Grable might need a revision of his prior laminectomy.  (Tr. 86.)  He also

reported that Grable had had a multi-level cervical fusion since the May 2018 hearing.  (Tr. 88.)

Grable briefly testified again, explaining that he cannot do anything at home, although he tries.  He cannot do sedentary work because he "can't hold [his] neck down for a long period of time."  (Tr. 91.)  He cannot lift anything or stand for a long period of time because of his neck and lower back pain.  (Tr. 93-94.)  He spends most of his time laying down on his chair with his neck propped up.  (Tr. 94.)

The ALJ also questioned the vocational expert, Kristine Skahan, who listed several occupations that Grable could perform based on additional limitations that the ALJ provided, including photocopy machine operator; final assembler, optical goods; document preparer; order clerk, food and beverage; officer helper; mail clerk; and circuit board assembler.  (Tr. 104-105.)

## ALJ DECISION

Although the ALJ found that Grable's amended alleged onset date of disability after his first hearing "indicates [his] intent to withdraw his objection to termination," her decision still discussed evidence in the record from before that date.  (Tr. 10.)  She found that Grable had not engaged in substantial gainful activity since the CPD through the date of her decision.  (Tr. 12.)  She then determined that while Grable has suffered from post-laminectomy syndrome and degenerative disc disease since October 15, 2014, these impairments do not meet or medically equal

the severity of one of or a combination of the listed impairments in 20 C.F.R. § 404. (Tr. 12.)  Furthermore, the ALJ found that medical improvement occurred on October 15, 2014, and that this medical improvement was related to Grable's ability to work because it resulted in an increase in his RFC. (Tr. 13.)

Based on her consideration of the record, the ALJ found that Grable had an RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) but with certain limitations: he is limited to frequently climbing ramps and stairs and occasionally climbing ropes, ladders, and scaffolds. (Tr. 14.)   Based on Grable's RFC, the ALJ found that he could not perform his past relevant work as a tree trimmer.  (Tr. 21.)  However, she found that he could perform numerous other occupations, even when imposing additional limitations to account for his education and work experience, including the light, unskilled jobs of office helper, mail clerk, and photocopy machine operator, and the sedentary, unskilled jobs of final assembler, document preparer, and circuit board assembler. (Tr. 21-22.) Accordingly, the ALJ found that Grable's disability ended on October 15, 2014 and that he has not become disabled again since that date.  (Tr. 23.)

## ANALYSIS

I.  <u>The ALJ did not err in not identifying Grable's cervical spine impairment and neuropathy as separate severe medical impairments.</u>

After concluding that Grable's post-laminectomy syndrome and degenerative disc disease were severe medical impairments, the ALJ mentioned that the record

also contained references to insomnia, depression, and alcohol use disorder. She explained that she did not consider these to be severe impairments because Grable only received intermittent primary care treatment for his insomnia and depression and was never formally diagnosed with alcohol use disorder. The ALJ did not, however, discuss Grable's cervical spine impairment and sensory and motor polyneuropathy in this section of her decision. Grable argues that this was error and that these diagnoses should have been identified as severe medical impairments.

Under the Social Security regulations, a severe impairment is "an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities." 20 C.F.R. §§ 416.920(c), 416.921. The claimant bears the burden of proving that his impairment or combination of impairments are severe. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000)). The United States Court of Appeals for the Eighth Circuit has held that an ALJ's "failure to list a specific impairment at step two is not an error unless the impairment is 'separate and apart' from the other listed impairments." Gregory v. Comm'r, Soc. Sec. Admin., 742 F. App'x 152, 156 (8th Cir. 2018) (citing Gragg v. Astrue, 615 F.3d 932, 939 (8th Cir. 2010)). The Commissioner implicitly invokes this rule in her brief, arguing that "[a]lthough the ALJ did not specifically determine that 'cervical spine impairment' was a severe medical impairment, she did determine that [Grable's] impairments

included degenerate disc disease." The Commissioner did not, however, specifically discuss Grable's neuropathy diagnosis.

The ALJ explicitly discussed evidence in the record relating to Grable's cervical spine. (Tr. 16-19.) She noted that Grable began complaining of pain in his neck in 2016 and that he was referred for a cervical MRI in May 2016. (Tr. 975, 1186-87.)   In July 2016, he saw a neurologist, Dr. Ksenija Kos, who observed an unsteady gait ("probably sensory ataxia"), use of a cane, reduced strength in the left ankle, and pinprick and temperature appreciation absent over the feet and legs below the knees. (Tr. 1073.)   On June 11, 2018, Grable met with a neurosurgeon's physician's assistant, whose examination revealed tenderness to palpation in the cervical and lumbar spine and diminished light touch and pinprick in the C4 dermatome on the left and diffusely in the lower extremities.  He noted that Grable reported "constant" neck pain; lower back pain that worsened with heavy lifting, walking, and prolonged standing; difficulty performing daily activities; and frequent falling. (Tr. 1470-72.)  A cervical MRI revealed mild diffuse disc bulges and mild facet osteoarthritis at C2-C7 and mild left uncovertebral joint osteoarthritis at C5-6. (Tr. 1492-93.) Exam findings from another neurosurgery appointment on September 19, 2018 revealed full strength except for 4/5 weakness in right grip and 3 to 4 strength in ankle dorsiflexion on the left with minimal range of motion; decreased pinprick to his hands with normal pinprick in his shoulders and decreased pinprick

from his knees down; mute knees and ankles; antalgic gait; negative straight leg raise; and negative Patrick's tests.  (Tr. 1534.)

Grable underwent a cervical discectomy with fusion on November 19, 2018. (Tr. 1512-14.)  At a follow-up appointment with surgeon Dr. Phillipe Mercier about a month later, he reported some ongoing pain but improvement in sensation in his left hand.  (Tr. 1556.)  Dr. Mercier noted that he walked with a normal gait and exhibited full strength throughout upper and lower extremities.  (Tr. 1556.)  Dr. Mercier saw Grable again on March 13, 2019 and observed "some improvement in his symptoms," including walking, but he still had drop foot and used a cane.  (Tr. 1570.)  X-rays revealed "C-4 to C-7 instrumentation that is stable in appearance." (Tr. 1570.)

It appears that the ALJ's consideration of this evidence contributed to her conclusion that Grable suffered from degenerative disc disease.  (Tr. 18-19.) Because she considered this evidence, and because the cervical spine impairment does not appear to be "separate and apart" from Grable's other spinal issues, I do not find that she erred in failing to specifically identify Grable's cervical spine impairment as an additional severe impairment.  See Whitworth v. Saul, 2019 WL 4542864, at *4 (E.D. Mo. Sept. 18, 2019) (finding that ALJ did not err in concluding that claimant's lumbar stenosis was not a severe impairment because "the ALJ

considered all spine diagnoses—including lumbar stenosis—as part of a more broadly defined disorder, degenerative disc disease").

The ALJ referenced Grable's neuropathy diagnosis in her summary of Dr. Kos's July 25, 2016 examination, noting Dr. Kos's hypothesis that it could have been caused by his history of alcohol abuse. (Tr. 1073.)  She described the results of the EMG/NCS tests that Dr. Kos ordered.  They revealed evidence compatible with diffuse sensory motor peripheral neuropathy, which appeared to be axonal and moderate in severity; no CMAP amplitude recorded from the extensor digitorum brevis on the left; and evidence of chronic denervation in the peroneal nerve innervated muscles.  (Tr. 1166.)  An MRI of Grable's lumbosacral spine was recommended "in order to rule out L4-L5 chronic radiculopathy;" however, the ALJ noted that he did not appear to have followed up for this imaging.  (Tr. 17, 1166.) Finally, the ALJ cited Dr. Yasuo Ishida's September 2018 consultative exam, at which he opined that Grable's bilateral lower extremity neuropathy "may be radiculopathy relating to [his] accident."[4]  (Tr. 1499.)  She also cited Dr. Ishida's

---

[4] It seems that it is sometimes difficult to differentiate neuropathy and radiculopathy from one another because symptoms of each diagnosis "may overlap."   However, they are distinct diagnoses.  According to Johns Hopkins, "[p]eripheral neuropathy is the damage of the peripheral nervous system while radiculopathy "is the pinching of the nerves at the root."  "Radiculopathy," https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.   See also "Peripheral    Neuropathy    &    Radiculopathy,"    https://www.sracpain.com/conditions-we-treat/peripheral-neuropathy-radiculopathy/.

observations that Grable had reduced sensation in his legs and demonstrated difficulty getting on and off the exam table and in and out of the chair.  (Tr. 1499.)

It is not completely clear whether Grable's "neuropathy" is "separate and apart" from his degenerative disc disease, given the apparent uncertainty about whether neuropathy or radiculopathy was actually the proper diagnosis, and whether it stemmed from Grable's back problems or from his history of alcohol abuse.  This ambiguity in the record makes this case less clear-cut than others that have upheld an ALJ's failure to identify neuropathy as an additional severe impairment.  See Allred v. Kijakazi, 2021 WL 4399462, at *6 (E.D. Mo. Sept. 27, 2021) (finding no error when the ALJ did not identify claimant's diabetic neuropathy as a severe impairment because he found that claimant's diabetes was a severe impairment and "considered [claimant's] neuropathy in his RFC analysis including findings of decreased sensation"); Whitworth, 2019 WL 4542864, at *4 (finding that ALJ did not err in concluding that claimant's diagnosis of peripheral neuropathy secondary to chemotherapy was not a severe impairment because the neuropathy diagnosis "was encompassed in the ALJ's finding of severe Hodgkin's lymphoma history, status post curative treatment").

In any event, even if the ALJ erred in not specifically designating neuropathy or radiculopathy as a separate severe impairment, I find that such an error was harmless because she considered the symptoms that it caused in other steps of the

process.  See DeGroot v. Berryhill, 2019 WL 1316964, at *7 (E.D. Mo. Mar. 22,

2019) ("Where an ALJ errs by failing to find an impairment to be severe, such error

is harmless if the ALJ finds the claimant to suffer from another severe impairment,

continues in the evaluation process, and considers the effects of the impairment at

the other steps of the process") (citation omitted).  Here, in her summaries of

Grable's various visits to different providers, the ALJ noted that he experiences

numbness in his extremities; decreased sensation below the knees; weakness in his

upper extremities that causes him to drop things; and difficulty balancing because

his legs "give out" beneath him.  (Tr. 19-20.)  She summarized imaging and clinical

findings that corroborate Grable's complaints.  She also noted that on a few

occasions, providers indicated he had generally good or normal strength in his

extremities.  (Tr. 13, 18, 19, 1014, 1534, 1556.)  This evidence, in combination with

the fact that Grable did not pursue the additional diagnostic MRI recommended in

July 2016, appears to have influenced the ALJ's analysis of the severity of Grable's

neuropathy or radiculopathy at other points in the decision.  Because the decision

demonstrates that the ALJ considered the evidence detailed above, I find that any

possible error associated with the failure to designate an additional severe

impairment was harmless.

II.     The RFC that the ALJ formulated is not supported by substantial evidence.

The ALJ found that Grable had the RFC to do medium work, which requires the claimant to be able to lift no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).  In a footnote, she explained that, while her decision listed jobs suited for a light RFC based on the limitations she posed to the vocational expert during the hearing to account for Grable's additional limitations—including his age, education, and work experience—"it would be inappropriate to change the RFC to 'light,' as the regulations required the RFC to be the most a claimant can do, and the claimant is capable of performing more than 'light' exertional work."  (Tr. 22.)  She also noted that "the difference between light exertional work and medium exertional work under the regulations relates to the ability to lift and carry; the ability to stand and/or walk remains the same."  (Tr. 22.)  Grable argues that the ALJ "improperly drew inferences from the medical reports" and formulated the RFC based on her own impermissible interpretation of the "raw medical evidence," which he contends does not support the ability to perform medium work.

The Social Security regulations expressly state that the ALJ is "responsible for assessing residual functional capacity."  20 C.F.R. § 404.1546(c), 416.946(c).  See also Winn v. Comm'r, Soc. Sec. Admin., 894 F.3d 982, 987 (8th Cir. 2018).  In making this determination, the ALJ must consider "all the relevant evidence in [the

claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  While the ALJ has a duty to fully and fairly develop the record, she is not required to obtain additional medical evidence if the evidence of record provides a sufficient basis for her decision. Martise v. Astrue, 641 F.3d 909, 926-27 (8th Cir. 2011).

Beginning in early 2016, Grable repeatedly complained of pain in his back and neck.  (Tr. 964, 974, 976, 982, 1076, 1347, 1366, 1401, 1409, 1411, 1470-71, 1534.)  He demonstrated trouble walking.  (Tr. 1013, 1018, 1022, 1290, 1499, 1534.) He often used a cane.  (Tr. 1072, 1087, 1472, 1498, 1534, 1570.)  MRIs of his cervical and lumbar spine from June 2018 revealed multilevel degenerative disc disease, with diffuse disc bulges, mild bilateral facet osteoarthritis, moderate to severe central stenosis, disc height loss and disc desiccation, and annular fissure. (Tr. 1492-93.)  A lumbar X-ray from July 2018 revealed mild to moderate degenerative disc disease and status post posterior spinal fusion at L1-L5, and a CT of the lumbar spine from September 2018 revealed multilevel bilateral facet arthropathy, mild canal stenosis, and moderate bilateral neural foraminal stenosis. (Tr. 1495, 1538.)  Providers consistently noted tenderness (Tr. 981, 1046, 1052, 1290, 1473, 1499); heel/toe walk difficulties (Tr. 1022, 1499); and decreased cervical, lumbar, and ankle range of motion.  (Tr. 1014, 1046, 1052-54, 1290, 1498, 1506, 1534.)  In September 2018, Dr. Ishida said that he "doubt[ed]" Grable could

walk a block or stand for half an hour without trouble.  (Tr. 19.)  Dr. Ishida also represented that Grable "can lift 4 pounds overhead with either hand."[5]  (Tr. 1498.)

Much of the evidence on which the ALJ seemed to rely most heavily in making her RFC determination predated Grable's amended alleged onset date of January 14, 2016.  She cited the CDI Unit's September 2014 report; notes from visits with Dr. Smith wherein Grable commented that pain medicine provided him some relief; his admissions that he could walk for thirty minutes, drive a car, and occasionally hunt and fish; and his failure to stop smoking and seek follow-up treatment with specialists, pain management, imaging studies, and surgery.  (Tr. 20.)  Grable told Dr. Smith that pain medicine provided "some" relief during appointments on May 18, 2015, August 13, 2015, and November 17, 2015.  (Tr. 862, 868, 910.)  However, he also reported pain, limited activity level, poor balance, and numerous falls during those same appointments.  He admitted that he occasionally went hunting and fishing at the hearing held in 2015; the record does not indicate that he engaged in these activities after the amended alleged onset date.  (Tr. 50-51.)  While he did not pursue physical therapy after his neck surgery and also declined to pursue TENS therapy because he feared possible infection, a claimant's "failure to seek treatment" is not dispositive, though it certainly "may indicate the relative

---

[5] It appears that the ALJ did not give any weight to these findings because Dr. Ishida did not provide work-related functional limitations.  (Tr. 19.)

seriousness of a medical problem."  Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995).  Furthermore, the record overall demonstrates that Grable did seek treatment for his back issues; the ALJ's decision summarized the numerous regular visits he made to his primary care provider and to various specialists.  He was prescribed and regularly taking pain medicine.  And, as Grable emphasizes, the record clearly demonstrates that he sought and received treatment for his cervical spine issues, as he had surgery in November 2018.[6]

Some evidence in the record from after January 14, 2016 indicated that Grable might be experiencing some improvement in his symptoms.  For example, he did not use a cane at one appointment in February 2016. (Tr. 1022.)  On a few occasions, providers noted generally good or normal strength in his extremities.  (Tr. 1014, 1534, 1556.)  In June 2016, orthopedic surgeon Dr. Lukasz Curylo opined that Grable had "done well from [the April 2016 lumbar laminectomy revision]" and said that "from the lumbar standpoint, he can resume regular activities," while also noting that he would "likely require some type of a decompressive procedure [for the cervical spine] since he has severe stenosis and is starting to have myelopathy-type symptoms."  (Tr. 1014.)  Additionally, Grable exhibited "mild" improvement in

---

[6] While summarizing Grable's hearing testimony, the ALJ stated that "[h]e admitted that he still had not had the neck surgery recommended for him." (Tr. 15.)  Grable had the surgery between the first and second hearings.  The ALJ acknowledged that he had the surgery later in the decision. (Tr. 19.)

walking after his 2018 surgery, though he still had drop foot and relied on a cane, and the most recent X-rays of his cervical spine revealed C-4 to C-7 instrumentation that was "stable in appearance." (Tr. 1570.)

But even conceding that Grable may have experienced some improvement, the Eighth Circuit has recognized that "[t]he mere fact that [a claimant's]…problems have improved does not mean, in and of itself, that [he] can do medium work," especially when the claimant "still suffers" from other conditions that developed "since the initial onset of his disability and during his award period." Dixon v. Barnhart, 324 F.3d 997, 1001 (8th Cir. 2003). Despite the improvements that the ALJ noted, the record as a whole does not support her RFC determination. Of particular concern is the fact that the ALJ appeared to disregard all evidence relating to Grable's difficulty standing. She acknowledged that Grable "testified standing in one spot for a long time aggravates his back and leg condition" but discounted this testimony because "many jobs do not require standing in one spot for a prolonged period." (Tr. 20.) At the May 2018 hearing, Grable testified that he could stand for about 20 minutes at a time. (Tr. 130.) He further testified, and the record demonstrates, that he falls often, relies on his cane because his "legs give out all the time," has trouble walking, and has to sit or lay down often. (Tr. 130, 137, 1013, 1018, 1022, 1054, 1072, 1074, 1087, 1286, 1290, 1460, 1472, 1498-99, 1534, 1570.) The ALJ's decision does not reflect actual consideration of this evidence. As a

result, the case should be reversed and remanded for further consideration.  On remand, it is possible that the ALJ will need to further develop the record as to Grable's ability to stand, walk, and otherwise function in the workplace.

Because the case will be remanded, I decline to reach the other issues that Grable raised on appeal, as they may be affected by the ALJ's re-evaluation of the evidence in the record.  I note that if the ALJ discounts Grable's subjective complaints of pain again on remand, she should either focus on evidence in the record from after the amended alleged onset date of January 14, 2016 to support her credibility determination, or explain why she believes evidence from before that date is relevant to her analysis.

Accordingly,

**IT IS HEREBY ORDERED that,** pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings in accordance with this memorandum and order.

A separate Judgment is entered herewith.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 28th day of March, 2022.